**ESCONDIDO MUTUAL WATER COMPANY, City of Escondido, and Vista Irrigation District, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**San Pasqual Band of Mission Indians, Secretary of Interior, etc., et al., Intervenors.**

**SAN PASQUAL, LA JOLLA, RINCON, PAUMA AND PALA BANDS of MISSION INDIANS, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Escondido Mutual Water Company, City of Escondido and Vista Irrigation District, Intervenors.**

**The SECRETARY OF THE INTERIOR, acting in his capacity as trustee for the**

**Rincon, La Jolla and San Pasqual Bands of Mission Indians, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Escondido Mutual Water Company, City of Escondido and Vista Irrigation District, Intervenors.**

**Nos. 79–7625, 80–7012 and 80–7110.**

United States Court of Appeals,
Ninth Circuit.

March 17, 1983.

Paul D. Engstrand, Leroy A. Wright, San Diego, Cal., James C. Kilbourne, Washington, D.C., Robert S. Pelcyger, Boulder, Colo., argued, for petitioners; Jennings, Engstrand & Henrikson, Glenn, Wright, Jacobs & Schell, San Diego, Cal., C. Emerson Duncan, II, Duncan, Allen & Mitchell, Washington, D.C., on brief, for Escondido; Fredericks & Pelcyger, Boulder, Colo., on brief, for San Pasqual, etc.

---

**3.** U.S.Dist.Ct. for N. Dist. of Calif., Memorandum N.C. 75 0004 WTS (Jan. 28, 1982).

Joseph S. Davies, Jr., Joshua Rokach, FERC, Washington, D.C., argued, for respondent; John A. Cameron, Acting Asst. Sol., Kristina Nygaard, FERC, Washington, D.C., on brief.

## ORDER on PETITIONS FOR REHEARING

Before ANDERSON, FERGUSON and NELSON, Circuit Judges.

In these consolidated cases, petitions have been filed as follows:

1. A petition for rehearing and a suggestion for rehearing en banc filed December 20, 1982 by the Escondido Mutual Water Company, City of Escondido and Vista Irrigation District;

2. A petition for rehearing filed December 20, 1982 by the Secretary of the Interior;

3. A petition for rehearing filed December 16, 1982 by the San Pasqual, La Jolla, Rincon, Pauma and Pala Bands of Mission Indians;

4. A petition for rehearing filed December 23, 1982 by the Federal Energy Regulatory Commission. ·

In response to the petition for rehearing by the Federal Energy Regulatory Commission, the language in the panel opinion of November 2, 1982, in the middle of the first column of 5123 of the slip opinion, 692 F.2d 1223 at p. 1235, which states as follows:

First of all, any license issued by the Commission which includes conditions propounded by Interior will be subject to judicial review under section 313(b) of the FPA, 16 U.S.C. § 825*l*(b). Secondly, any failure by the Secretary of the Interior to conform to the statutory standard in proposing conditions pursuant to section 4(e) will be reviewable as a final agency action under the applicable provisions of the Administrative Procedures Act, 5 U.S.C. §§ 701–706 (1976). The spectre of an unconditional veto power, with which an appointed public official could frustrate the public policies underlying the FPA, is illusory.

has been amended to read as follows:

Any license issued by the Commission which includes conditions propounded by Interior will be subject to judicial review under section 313(b) of the FPA, 16 U.S.C. § 825*l*(b). The spectre of an unconditional veto power, with which an appointed public official could frustrate the public policies underlying the FPA, is illusory.

With that amendment to the opinion, Judges Ferguson and Nelson have voted to deny all the petitions for rehearing and to reject the suggestion for rehearing en banc.

Attached hereto is a statement of Judge Anderson. Judge Anderson would grant and deny the various petitions for rehearing as stated in his concurring and dissenting statement.

The full court has been advised of the suggestion for en banc rehearing and no judge of the court has requested a vote on the suggestion for rehearing en banc. Fed. R.App.P. 35.

The petitions for rehearing are denied and the suggestion for a rehearing en banc is rejected.

J. BLAINE ANDERSON, Circuit Judge, concurring and dissenting:

I concur in denial of the petitions for rehearing filed by the Secretary of Interior and the San Pasqual, La Jolla, Rincon, Pauma and Pala Bands of Mission Indians ("Bands"). For the following reasons, however, I dissent from denial of the petitions for rehearing filed by Escondido Mutual Water Company, City of Escondido, Vista Irrigation District ("Licensees"), and the Federal Energy Regulatory Commission ("FERC"). Except for the reservations expressed below, I continue to concur in the majority opinion.

## I. INDIAN CONSENT

### A. *Mission Indian Relief Act*

Petitioners persuasively argue that our opinion misinterprets § 8 of the Mission Indian Relief Act ("MIRA"). 26 Stat. 712 (1891). Section 8 provides in pertinent part:

Subsequent to the issuance of any tribal patent, ... any citizen of the United States, firm, or corporation may contract with the tribe, band, ... for the right to construct a flume, ditch, canal, pipe, or

other appliances for the conveyance of water over, across, or through such lands, which contract shall not be valid unless approved by the Secretary of the Interior under such conditions as he may see fit to impose.

We interpreted § 8 as the exclusive means by which a private party may obtain a right-of-way across reservations created pursuant to MIRA. *Escondido Mutual Water Co. v. Federal Energy Regulatory Commission,* 692 F.2d 1223, 1231–34 (9th Cir.1982). Our interpretation necessarily implies that the Bands, by withholding consent, can completely bar the licensing of a federal power project. Our interpretation further provides no recourse to the proposed licensee if Indian consent is arbitrarily or improvidently withheld. Upon reconsideration, I believe our interpretation of § 8 conflicts with the Federal Power Act's ("FPA") pervasive scheme for obtaining rights-of-way over tribal lands.

The opinion relies heavily on legislative history which I believe is rather weak support for our sweeping holding. The 1969 House Committee Report, 692 F.2d at 1232, says nothing more than that a federal agency exceeds its authority if it grants rights-of-way without congressional delegation. The 1887 Attorney General opinion, *id.* at 1232–33, is merely an example of that proposition; an administrative agency (Interior) to whom Congress had not delegated power to grant rights-of-way. That opinion may have led to MIRA § 8, but the legislative history bears no indication that Congress intended § 8 as the exclusive means of obtaining rights-of-way. In 1891, perhaps contractual negotiation was the only means thought necessary to obtain rights-of-way from Mission Indians, especially given that the Attorney General opinion addressed a water project concededly beneficial to the Indians. More probably, however, Congress simply gave no thought to the eminent domain matter; contractual negotiation resolved the immediate problem.

A farther-sighted Congress subsequently enacted the FPA. In it, Congress recognized that contractual means may sometimes fail to obtain rights-of-way necessary to a federal power project. Section 21, for example, provides an alternative to the contractual process by delegating to licensees of federal power projects the power of eminent domain. FPA § 21, 16 U.S.C. § 814. Though that condemnation power is inapplicable to reservations held in trust by the United States, § 21 may be applied to Indian lands held in fee. *Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960).[1]

The FPA employs a different and much more protective scheme for acquiring the use of tribal lands within Indian reservations. Unlike privately owned property which may be utilized as required, FERC, under FPA § 4(e), 16 U.S.C. § 797(e), may license the use of tribal lands within an Indian reservation only upon a finding "that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired." Even then, the license is subject to terms and conditions which the Secretary of Interior shall deem necessary for the adequate protection and utilization of the reservation. *Id.*

Moreover, unlike privately owned property which a licensee may condemn outright under § 21, tribal lands within an Indian reservation may be used only upon payment of an annual rental charge. FPA § 10(e), 16 U.S.C. § 803(e). The rental charge is subject to approval "of the Indian tribe having jurisdiction of such lands" as provided in § 16, 25 U.S.C. § 476, of the Indian Reorganization Act. I believe Congress intended FPA §§ 4(e) and 10(e) to be the counterparts in the tribal land sector to FPA § 21 in the private land sector.

The majority acknowledges that Congress may exercise the condemnation power over tribal lands and may pass legislation delegating to a person or agency seeking a

---

1. In *Tuscarora,* the Supreme Court recognized that to subject trust reservation land to condemnation would amount to the sovereign con-demning its own property. 362 U.S. at 113–14, 80 S.Ct. at 551–52, 4 L.Ed.2d at 594–95.

right-of-way that condemnation power. 692 F.2d at 1232. The majority and I disagree on the extent to which such an act of Congress must refer specifically to Indians. *Tuscarora* teaches that meticulous specificity is unnecessary. In responding to the Tribe's argument that § 21 of the FPA could not apply to Indian lands because it did not specifically mention them, the Court observed, "it is well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." 362 U.S. at 116, 80 S.Ct. at 553, 4 L.Ed.2d at 596.

Even if a special act of Congress is necessary, I cannot conceive of a more direct and specially-tailored scheme for appropriation of Indian lands than the FPA. *Tuscarora,* although addressing the somewhat novel issue of Indian lands held in fee, says as much:

> The Federal Power Act constitutes a complete and comprehensive plan for the development and improvement of navigation and for the development, transmission and utilization of electric power in any of the streams or other bodies of water over which Congress has jurisdiction under its commerce powers, and upon the public lands and reservations of the United States under its property powers. See § 4(e). It neither overlooks nor excludes Indians or lands owned or occupied by them. Instead, as has been shown, the Act specifically defines and treats with lands occupied by Indians— "tribal lands embraced within Indian reservations." See §§ 3(2) and (10)(e). The Act gives every indication that, within its comprehensive plan, Congress intended to include lands owned or occupied by any person or persons, including Indians.

362 U.S. at 118, 80 S.Ct. at 554, 4 L.Ed.2d at 597.

Legislative history of the FPA is also at odds with our opinion. In 1920, an amendment to the Water-Power bill (the FPA's predecessor) was proposed that would prohibit the issuance of any license affecting tribal lands within Indian reservations, except by and with consent of the tribal council. The Senate conferees rejected the amendment, seeing "no reason why water-power use should be singled out from all other uses of Indian reservation land for special action of the council of the tribe." H.R.Rep. No. 910, 66th Cong., 2d Sess. 8 (1920). In the face of this compelling legislative history, and upon reconsideration of the FPA's many provisions addressed directly to Indians, I can no longer adhere to our prior conclusion that MIRA § 8 is the exclusive means by which rights-of-way for FPA licensed projects over Mission Indian land can be obtained.

### B. *Indian Reorganization Act*

Section 16 of the Indian Reorganization Act ("IRA"), 25 U.S.C. § 476, contains a sweeping provision pertaining to Indian property rights:

> In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: ... to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in land, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments.

In order for an Indian tribe to enjoy the powers and benefits conferred by § 16, it must organize and operate under a constitution that is "ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation ...." *Id.* The constitution must then be approved by the Secretary of the Interior. *Id.* Because the San Pasqual Band adopted a constitution pursuant to IRA, we must decide whether § 16 prevents an FPA licensee from obtaining rights-of-way absent Indian consent. I would hold it does not.

The purposes of IRA § 16 were twofold. First, the section was designed to encourage Indians to revitalize their self-government by establishing a basis for the adoption of tribal constitutions. *Fisher v. District Court,* 424 U.S. 382, 387, 96 S.Ct. 943, 946, 47 L.Ed.2d 106, 111 (1976); *Mescalero*

*Apache Tribe v. Jones,* 411 U.S. 145, 152–52, 93 S.Ct. 1267, 1272–73, 36 L.Ed.2d 114, 120–21 (1973). Second, the section was one important element of an overall statutory scheme designed to put an end to piecemeal legislation authorizing sale of Indian lands and to allotment of tribal lands to individual members of a tribe. 78 Cong.Rec. 11123. *See* F. Cohen, *Handbook of Federal Indian Law* 516–17 (1982 ed.). The legislative history does not reveal Congress' intent, in enacting IRA § 16, to supplant the federal government's power to dispose of or reclassify the use of its own property. As Cohen concludes, "Congressional power to extinguish Indian ownership by plain and specific legislation is plenary, so long as Congress compensates the tribes for the abrogation of recognized title as required by the Fifth Amendment." *Id.* at 517. For the same reasons as discussed in the preceding section under MIRA, I conclude that § 16 of IRA is not the exclusive means for obtaining rights-of-way by FPA licensees.

Certainly, contractual negotiation and agreement of the parties is the preferred method of acquiring rights-of-way across Indian lands. But failing consent, I believe §§ 3(2), 4(e), and 10(e) of the FPA are express congressional authority for acquiring such property. Substantial protections for existing Indian property rights are built into FPA § 4(e), which requires that "the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired." The majority recognized that after imposing certain conditions regarding delivery of water, FERC made the § 4(e) finding. 692 F.2d at 1228. I would grant the Licensees' and FERC's petition for rehearing, and on rehearing, I would focus specifically on the definition of reservation "purpose" and the extent to which FERC's § 4(e) finding was supported by substantial evidence and I would so find and affirm. *Cf.* Note, *Tribal Consent and the Lease of Indian Lands for Federal Power Projects,* 59 Minn.L.Rev. 385, 416–19 (1974) (suggesting a broad definition of reservation "purpose").

## II. INTERIOR'S CONDITIONS

As previously indicated, § 4(e) of the FPA provides that licenses issued within any reservation are subject to those terms and conditions which the Secretary of Interior deems necessary for the adequate protection and utilization of the reservation. 16 U.S.C. § 797(e). Holding these conditions mandatory on FERC, our opinion reasons that § 4(e) does not vest Interior with an "unconditional veto power" over FERC's licensing authority because (1) licensing proceedings are subject to judicial review in the court of appeals, and (2) conditions imposed by Interior are final agency action under the Administrative Procedure Act reviewable in the district court. 692 F.2d at 1235.

Disregarding for the moment our conclusion that judicial review minifies the veto power, our reasoning was unsound. Section 313(b) of the FPA, 16 U.S.C. § 825*l*(b), vests exclusive jurisdiction in federal courts of appeal to determine on review of a licensing proceeding whether statutory standards have been satisfied. *City of Tacoma v. Taxpayers,* 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958). Conditions imposed by Interior under § 4(e) must necessarily be among those reviewable standards because they constitute an integral part of the final licensing decision. It was not the intent of Congress to fragment review of a final FPC order from review of a secretary's statutory duties under the FPA. *See State of North Carolina v. Federal Power Commission,* 393 F.Supp. 1116 (M.D.N.C.1975) (action to enjoin FPA licensee pending the Secretary of Interior's finding that the license would not adversely impact a waterway designated under the Wild and Scenic Rivers Act; the district court dismissed, citing FPA § 313(b) as the exclusive avenue for review). Such bifurcation of review conflicts with the law of this circuit, that "Congress may select the forum in which review may be had and special statutory review procedures take precedence over whatever nonstatutory review might otherwise be available in the district court." *Nevada Airlines, Inc. v. Bond,* 622 F.2d 1017, 1020 (9th Cir. 1980); *UMC Industries, Inc. v. Seaborg,* 439 F.2d 953, 955 (9th Cir.1971).

In light of the foregoing precedent, I join in modification of this portion of the opinion on denial of rehearing. The larger issue, however, is whether our conclusion—that conditions imposed by Interior under § 4(e) are mandatory on FERC—should remain intact.

All parties agree the Secretary may not fix conditions impossible of fulfillment and thus block the use of all tribal land. His determinations are tested by reasonableness; that is, he may impose conditions *reasonably* deemed "necessary for the adequate protection and utilization of such reservation." I agree conditions imposed by the Secretary are mandatory on FERC to the extent they are reasonable; the crucial issue is which forum—the Secretary of Interior, FERC, or the reviewing court—is to decide reasonableness.

I would place the initial reasonableness decision on FERC, for it is, after all, the forum in which the initial factfinding function is vested. FPA § 4, 16 U.S.C. § 797. *See Scenic Hudson Preservation Conference v. Federal Power Commission,* 354 F.2d 608, 620 (2d Cir.), *cert. denied,* 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1965) ("The Commission has an affirmative duty to inquire into and consider" all facts relevant to the decisionmaking standards imposed by the statutory scheme.). FERC's written findings of fact and supporting reasoning would then be subject to review in the court of appeals. I believe this procedure would preserve the control of FERC over licensing, and at the same time respect the Secretary's statutory duty to protect the reservations. I would, therefore, conclude that the FERC properly interpreted and applied § 4(e) and that all of its findings in that regard are supported by substantial evidence.

I would also sustain the FERC's findings and conclusions denying a retroactive remedy for annual charges to 1924. These are damages traditionally awarded by a court for unlawful trespass. The FERC has no statutory or common law authority to consider and assess damages in this case. It was correct in so holding.